IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 18-cv-00812-MSK-KMT

_____

DEPOSITION OF:  JUSTIN DANIEL MOHN - January 25, 2019
    (CONFIDENTIAL AND NON-CONFIDENTIAL TRANSCRIPT)

_____

Justin Mohn

Plaintiff,

v.

PROGRESSIVE CASUALTY INSURANCE COMPANY,

Defendant.

_____

          PURSUANT TO NOTICE, the deposition of
JUSTIN DANIEL MOHN was taken on behalf of the
Defendant at 212 North Wahsatch Avenue, Suite 100,
Colorado Springs, Colorado 80903, on January 25, 2019,
at 9:00 a.m., before Tina M. Stuhr, Registered
Professional Reporter and Notary Public within
Colorado.

# EXHIBIT A

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 2

A P P E A R A N C E S

Appearing Pro Se:

      JUSTIN DANIEL MOHN
      1625 East Woodmen Road
      Apartment 49
      Colorado Springs, Colorado  80920

For the Defendant:

      MARGARET PARNELL HOGAN, ESQ.
      Littler Mendelson, P.C.
      1900 Sixteenth Street
      Suite 800
      Denver, Colorado  80202

Also Present:

      Patricia Weisberg (Appearing Telephonically)
      Jacqueline Rhone (Appearing Telephonically)
      Jim Lawson (Appearing Telephonically)

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 75

1  **working, receiving job objectives?**

2  A.  I believe I recall it was around the

3  academy time, but perhaps I'm mistaken.  I don't know

4  if maybe they were given sooner.

5  (Deposition Exhibit 8 was marked.)

6  **Q.  Now, if you'll take a look at Exhibit 8,**

7  **after taking a look at that, does that refresh your**

8  **memory about whether or not you received job**

9  **objectives?**

10  A.  Yeah.  Absolutely.

11  **Q.  And were they the objectives listed at**

12  **Exhibit 8?**

13  A.  This seems to be the objectives that you

14  were referring to, yes.  That seems to be correct.

15  **Q.  What was your understanding about the**

16  **other requirements to -- well, strike that.**

17  **Did you have to graduate from the**

18  **academy?**

19  A.  Yes.

20  **Q.  What was your understanding of the**

21  **requirements to graduate from the academy?**

22  A.  That there was a certain metric -- there

23  was a couple of metrics that had to be met, I guess,

24  either early enough or consistently enough that -- in

25  combination with our customer service to the customers

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 76

1  that the coach and manager felt we were ready to

2  graduate from academy.

3       Q.   In your instance the coach was

4  Mr. Lofthus; is that right?

5       A.   That is correct.

6       Q.   And the manager was Ms. Auld-Feldman?

7       A.   Yes.

8       Q.   Okay.  What did you consider to be

9  on-time graduation from the academy?

10      A.   Well, Greg Lofthus told me that it was --

11 average was 10 to 12 weeks.  I believe I had asked --

12 I had inquired to Greg about graduating around weeks 8

13 to 9 -- not asking can I graduate around week 8 to 9,

14 but when -- you know, when are we looking at

15 graduation times and that was his answer, 10 to 12

16 weeks.

17      Q.   Okay.  I'm sorry, I didn't understand

18 your answer.  You said that on-time graduation --

19 well, strike that.

20           My question was what did you consider to

21 be on-time graduation and you responded that

22 Mr. Lofthus told you somewhere between 10 to 12

23 weeks --

24      A.   Yes.

25      Q.   -- is that correct?

**JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL**
**Justin Mohn v. Progressive Casualty Insurance Company**

Page 87

1    ago, but it looks accurate.

2          Q.   **This is about four days after Exhibit 10;**

3    **is that right?**

4          A.   That is correct.

5          Q.   **Okay.  In this e-mail string Greg Lofthus**

6    **provides you with more feedback and offered to meet**

7    **with you that day; is that correct?**

8          A.   It looks that way, yes.

9          Q.   **Okay.  Do you recall the purpose of that**

10   **meeting?**

11         A.   To go over the rest of the phone calls, I

12   believe.  I don't think there was any other purpose to

13   the meeting.

14         Q.   **So your coach is consistently meeting**

15   **with you to go over your progress; is that right?**

16         A.   That is correct.

17         Q.   **Okay.**

18              **(Deposition Exhibit 12 was marked.)**

19         Q.   **Mr. Mohn, can you identify Exhibit 12 for**

20   **the record, please?**

21         A.   Certainly.  It looks like it is an e-mail

22   from Greg to me copying Beverly Auld-Feldman in

23   regards to a tracking sheet for HHV offers which I

24   believe is home -- home insurance policies.

25         Q.   **Household view; is that right?**

**JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL**
**Justin Mohn v. Progressive Casualty Insurance Company**

Page 88

1     A.   Oh, you're right.

2          **Q.   Okay.  Yes?**

3     A.   Yes.

4          **Q.   Okay.  And Auld-Feldman --**

5     **Ms. Auld-Feldman was your manager at this time; is**

6     **that correct?**

7     A.   That is correct.

8          **Q.   Okay.  It looks like in weeks six and**

9     **five -- the beginning of this is the take rate results**

10    **for you, is that right, beginning of this e-mail?**

11    A.   We might be looking at different ones.

12         **Q.   Can I see that?**

13    A.   Oh.  Oh.  Okay.  This page.

14         **Q.   Yep.**

15    A.   That looks to be correct, yes.

16         **Q.   Then you -- it looks like you e-mailed**

17    **Mr. Lofthus an Excel spreadsheet and a link to a**

18    **website about programming video games; is that right?**

19    A.   Programming anything in general, but,

20    yeah, programming video games is one of the things you

21    can do with that website.

22         **Q.   Okay.  Then he thanked you and then you**

23    **replied back in the string about -- that you weren't**

24    **going to use -- well, to quote, you said, ". . . just**

25    **like yesterday I'm not going to bother using the**

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 105

1    because I was thinking -- to answer your question --

2    that I was getting to that point sometime around week

3    8, 9, 10.

4         Q.   **You were told by Mr. Lofthus that there's**

5    **no set time for graduation from academy, but that it's**

6    **typically between weeks 10 and 12, right?**

7         A.   The average, yeah.

8         Q.   **Who do you specifically believe was**

9    **treated more favorably than you?**

10        A.   The majority of females in my training

11   class, Donna Dover, Natasha Franklin, what's her name,

12   Terry or Teresa.  I'm sorry, I'm not good with names.

13        Q.   **So there's Donna Dover, Natasha Franklin.**

14   **Is there anyone else?**

15        A.   There's at least one or two.  I -- I can

16   reserve the right to answer that at trial because I

17   don't recall the exact names of the people at this

18   time, but there were --

19        Q.   **What do you need to refresh your memory**

20   **about this?**

21        A.   If you had a list of the names of the

22   girls in my training class or the people in my

23   training class.  There was just one other guy.

24        Q.   **And what do you believe -- we'll get to**

25   **that.  Why do you believe that Ms. Dover and**

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 106

1 **Ms. Franklin, and whoever the other people would be,**

2 **what are you basing it on that they were treated more**

3 **favorably than you?**

4       A.   I know they graduated before me.

5       **Q.   Right.  You didn't see their numbers**

6 **though, right?**

7       A.   Yeah, that is correct, I did not see

8 their numbers, but Natasha sat next to me and I could

9 tell -- and so this is subjective, but I could tell

10 from the difference between our phone calls that it

11 seemed like there was not much comparison between the

12 level of customer service being given between me and

13 people like Christopher Lewis compared to some of

14 these girls in my training class who would literally

15 put their customers on hold and have conversations

16 with each other.

17       **Q.   Every academy participant had a coach,**

18 **right?**

19       A.   That is correct.

20       **Q.   And the coach -- as far as you know, the**

21 **coach's -- what the coach would do was listen to phone**

22 **calls, right?**

23       A.   That is correct.

24       **Q.   Since you don't have access to any of**

25 **these individual's -- you didn't have access to any of**

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 107

1    these individuals' metrics, you wouldn't know whether

2    or not their coach thought they were good or bad,

3    right?

4         A.   For the most part, that would be correct,

5    but as I had stated, the global e-mails really -- they

6    tell quite a story as to who was the top performers of

7    the department.

8         Q.   And you said you knew because you sat

9    next to, I think, Ms. Dover; is that right?

10        A.   No.  I sat next to Natasha.

11        Q.   Okay.  Ms. Franklin?

12        A.   Yes.

13        Q.   So you're basing that on what you

14   overheard, even though during the same time period,

15   you were supposed to be working and conducting your

16   own calls, right?

17        A.   Absolutely.

18        Q.   So some of the other individuals in your

19   training group include Allison Lopp, L-o-p-p.

20        A.   Um-hum.

21        Q.   Rachel Elizabeth Wixen, Yvette Domini,

22   and Angela Ackman.  Do you believe that you were more

23   qualified than those women?

24        A.   From the training class -- so before

25   academy, just in training, I believe I was more

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 108

1  qualified than all of them except the last name

2  L-o-p-p.  What was her first name?

3         Q.    That was the first name.  Allison Lopp.

4  It was the first name I read to you.

5         A.    Yeah.  Yeah, sorry, I said her last name,

6  like her surname.  But, yeah, L-o-p-p, she -- she was

7  pretty smart and she was very talented at her job to

8  the extent that we could tell in training that she was

9  going to do very well, and so I would say she was on

10  an equal if not better footing than me.

11         Q.    What about Ms. Frank -- you said you

12  thought Ms. Franklin was not.  What about Ms. Wixen?

13         A.    I do not think that she was in the same

14  category of capabilities of performing the role as

15  people like me and Allison Lopp.  And yet she did

16  graduate before me.

17         Q.    What about Ms. Domini, Yvette?

18         A.    Yvette Domini.  I think -- is she the one

19  that -- oh, no.  I hardly recall her, but I do recall

20  that she was another one of the people that graduated

21  before me, as well as in training I wouldn't consider

22  her as an employee with as much potential as myself

23  and Allison, but I don't recall how she did in

24  academy.  All I know is she graduated before me.

25         Q.    And when you say "training," you mean

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 109

1    that initial training on Progressive policies that you

2    attended with Ms. Vannier?

3         A.    Yes.

4         Q.    Okay.  So if we go -- just to remind you

5    of the time period that we're talking about, you

6    graduated March 7, 2017.  So put yourself back in that

7    time period.  Did you make a complaint to human

8    resources at that time stating that you felt you were

9    treated unfairly?

10        A.    I did not.

11        Q.    Why is that?

12        A.    Well, I was new out of academy and kind

13   of wanted to try to remedy the situation in-house, see

14   if the situation could just be resolved because now I

15   was out of academy and really the bulk of the

16   situation which I had considered discrimination to

17   have occurred seemed to have been over, and so that's

18   why I didn't complain.  And then like we were talking

19   about earlier, that I was dealing with some other

20   issues, legal issues.

21        Q.    Your charge of discrimination, the orders

22   of protection against Ent --

23        A.    Yes.

24        Q.    -- entered against you by Ent?

25        A.    Yes.

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 125

1  so as you can see, she laughed out loud after I said

2  that.

3  **Q.  Did you continue to have discussions with**

4  **Ms. Coffey about your leave of absence by IM?**

5  A.  Yes, because we did so throughout my --

6  while I was on the leave of absence, while I was in

7  Sacramento, I asked her as well as, I believe, an HR

8  rep if it was going to be fine for me to drive by the

9  Sacramento site and check it out.

10  (Deposition Exhibit 23 was marked.)

11  **Q.  Exhibit 23 is another instant message**

12  **string with Ms. Coffey about your leave of absence; is**

13  **that right?**

14  A.  That's correct.

15  **Q.  And it occurs on June 23, 2017; is that**

16  **right?**

17  A.  Yes.

18  **Q.  Okay.  She informed you that Progressive**

19  **was working hard to accommodate your request, but that**

20  **it takes some time to have those accommodation**

21  **processes approved; is that right?**

22  A.  That's correct.

23  **Q.  You ask her at 10:30 a.m. in this**

24  **conversation, "Am I being a troll"; is that right?**

25  A.  That is correct.

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 127

1          A.    Yeah, that is correct.

2          Q.    **Okay.  So as of that date, you knew that**

3     **you could -- that Progressive had approved your leave**

4     **of absence; is that right?**

5          A.    Yes.

6          Q.    **Okay.  And then they followed up with a**

7     **letter to you from HR, is that right, about your leave**

8     **of absence?**

9          A.    I don't see that in this exhibit, but I

10    do recall something of that nature occurring.

11         Q.    **You recall receiving a letter?**

12         A.    Yeah.  I think they -- yeah, I think I

13    even got it by mail.

14               (Deposition Exhibit 25 was marked.)

15         Q.    **Mr. Mohn, is Exhibit 25 a letter that you**

16    **received from human resources approving your leave of**

17    **absence?**

18         A.    This is the letter.

19         Q.    **Okay.  This letter was produced to us by**

20    **you during the course of discovery.  Does that -- does**

21    **that sound right to you?**

22         A.    That is correct, yeah.

23         Q.    **Okay.  With this letter you also produced**

24    **an itinerary for a trip to Las Vegas.  Why did you**

25    **produce that and what were you doing in Las Vegas?**

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 128

1        A.   Well, I like to be a transparent person.

2   I was saying what I did on my personal leave of

3   absence.  I not only went to Sacramento, California,

4   to see if I would want to transfer there, I went to

5   Las Vegas because why not, it's a vacation.

6        **Q.   Well, it's a personal leave of absence,**

7   **right?**

8        A.   Yes.  Well, I stated that incorrectly.

9   My apologies.  I knew a legal issue was brewing, and

10  theoretically if I had gotten a music deal in Las

11  Vegas, it would have resolved the issue.  I could have

12  stayed in Las Vegas and been a musician.

13       **Q.   Okay.  It looks like -- according to the**

14  **itinerary that's part of Exhibit 25, it looks like you**

15  **returned from Las Vegas on June 26th and then flew to**

16  **Sacramento, California, the next day on the 27th; is**

17  **that right?**

18       A.   That is correct.

19       **Q.   What did you do in Sacramento?**

20       A.   Not too much.  When I got there, I --

21  I -- I explored places to live, apartments nearby the

22  Progressive site in that city, and then that night I

23  went salsa dancing.

24       **Q.   Did you go to the Progressive office?**

25       A.   I drove by.  They told me that I wasn't

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 137

1  Q.  Okay.  If you look at your resume, again

2  that's Exhibit 27, what on your -- you were applying

3  for an IT service desk position, right?

4  A.  That's correct.

5  Q.  What on your resume do you feel qualified

6  you for the IT service position -- service desk

7  position?

8  A.  Well, the -- what I was thinking was that

9  it was an entry-level role that would take people

10  regardless of their experience, even if they didn't

11  have experience in the IT field.  My only -- I don't

12  even know if this would be considered a qualification

13  for such a role was that I taught myself computer

14  programming and had implemented it at another company,

15  very briefly, just a program, an Excel spreadsheet for

16  a boss.

17  Q.  Mr. Baughman didn't agree, did he?

18  A.  He did not.

19  Q.  Okay.

20  (Deposition Exhibit 28 was marked.)

21  A.  I'm sorry, before we go on to the next

22  question, can I go to the bathroom or are we going to

23  do lunch soon?

24  Q.  We can do a quick -- it might be a little

25  bit, so why don't you set that aside and we'll go off

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 138

1    the record.

2            A.   Okay.

3                 (Recess taken, 11:38 a.m. to 11:43 a.m.)

4                 MS. HOGAN:  Back on the record.

5            Q.   (BY MS. HOGAN)  So, Mr. Mohn, if you

6    could put your -- actually, we -- let's see.  Can I

7    just see what I put in front of you?

8                 Okay.  So you've got your Exhibit 28,

9    which is --

10                MS. HOGAN:  Is that right?

11                THE COURT REPORTER:  Yes.

12           Q.   (BY MS. HOGAN)  And just for the record,

13   that is an e-mail from Charlie Baughman -- an e-mail

14   exchange between you and Mr. Baughman; is that right?

15           A.   That is correct.

16           Q.   And it's dated -- bear with me.  Let me

17   get that back in front of me.  It's dated -- the last

18   iteration is July 22, 2017, right?

19           A.   That is correct.

20           Q.   Okay.  You had -- you had e-mailed him

21   the day before, excuse me, on July 21st, and talked

22   to him about the position at the IT service desk,

23   right?

24           A.   That is correct.

25           Q.   He told you -- you told him that you

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 139

1    thought you were qualified.  He reviewed the minimum

2    requirements for the position alongside your

3    description of what you thought made you qualified and

4    told you that he did not believe -- it doesn't appear

5    to match what's minimally required so he wouldn't

6    allow a deviation from the one-year requirement,

7    right?

8         A.   For the most part, right.  I didn't say I

9    thought I was qualified.  I was hoping I was

10   qualified.  I was asking him if I [sic] felt I was

11   qualified, but, yes, then he said, I don't feel you're

12   qualified.

13        Q.   Okay.  And he reiterates at the end of

14   the e-mail that even if he had agreed that there

15   should be a variation or exception to the one-year

16   rule, that would just be that you would get to apply

17   and potentially be interviewed, that wouldn't mean

18   that you'd get the job, right?

19        A.   Exactly.

20        Q.   You understood that, right?

21        A.   I did.

22        Q.   Okay.  You also in the same time period

23   applied to be a senior copywriter; is that correct?

24        A.   Yes.

25        Q.   Okay.  Still under a year at Progressive;

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 140

1    **is that correct?**

2         A.    That is correct.

3         **Q.    What do you believe qualified you for**

4    **that role?**

5         A.    A couple of things.  One, I had been

6    writing for several years and so I believe I met --

7    even though it's a -- it might sound lofty with the

8    title senior, I believe I met the requirements because

9    it said a -- I recall it saying -- I don't remember

10   exactly.  We might find out from documents that it

11   said a combination of education and experience could

12   be a fit for the role, and so I had a combination of

13   education and I think at that point around three or

14   four years of private personal writing experience from

15   publishing two books, and so that's why I felt that --

16   and, of course, the main factor was that Charlie said

17   that because of my writing experience, he would

18   consider me for roles before a year that were writing

19   entailed.  Not that he would just give me the role,

20   that he would, you know, maybe look into it.

21        **Q.    Well, he suggested that you indicate that**

22   **interest by talking to people about writing for the**

23   **PEN, and you didn't follow up with that person, right?**

24        A.    I didn't follow up with Debi.  I followed

25   up with Andrew Segedi.

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 141

1         Q.    About the PEN?

2         A.    Yes.  I believe in one of those exhibits

3    I had talked to Andrew about the PEN.  I think he's

4    the one that told me that you don't get paid for the

5    PEN.

6         Q.    Okay.  So you didn't follow up, so you

7    didn't do any writing for the PEN?

8         A.    I did not do any writing for the PEN.

9         Q.    Okay.  The senior copywriting position

10   was -- required either a bachelor's degree in

11   communications, journalism, English, liberal arts,

12   humanities, media studying -- media studies, or

13   advertising.  Does that sound right to you?

14        A.    That -- I don't recall exactly, but that

15   sounds accurate, yes.

16        Q.    Or in lieu of that degree -- which you

17   didn't have any of those degrees, right?

18        A.    No, I do not.

19        Q.    In lieu of a degree, you could have a

20   minimum of eight years creative writing experience and

21   experience as a copywriter.  So you had creative

22   writing experience in writing your books, your two

23   books.  Those were not copywriting -- that was not

24   copywriting; is that correct?

25        A.    I don't know the extent of copywriting,

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 142

1　but I also did the covers of my books, and so perhaps

2　I -- no, it would not be considered fully copywriting.

3　　　　　**Q.　And how many years -- you had -- at the**

4　**time you indicated your interest at Progressive how**

5　**many years had it been since you graduated from**

6　**college?**

7　　　　　A.　I graduated in 2014.　This is 2017.

8　　　　　**Q.　So three years?**

9　　　　　A.　About three years, yeah.

10　　　　　**Q.　So you didn't have eight years of**

11　**experience, right?**

12　　　　　A.　I definitely didn't have eight years of

13　experience.

14　　　　　**Q.　So you weren't qualified for that, right?**

15　　　　　A.　I guess I misread the part about the

16　bachelor -- of what degrees could account for that

17　experience.

18　　　　　**Q.　And let me give that to you.**

19　　　　　　　　MS. HOGAN:　Can you mark that?

20　　　　　　　　(Deposition Exhibit 29 was marked.)

21　　　　　**Q.　(BY MS. HOGAN)　If you look at**

22　**Exhibit 29, which is the senior copywriter posting**

23　**that you applied for, and you look at Page 3 of that**

24　**exhibit, about two-thirds of the way down it lists the**

25　**education and experience if you want to take a look at**

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 143

1     that.

2         A.    Yeah, it's absolutely correct.  I -- I

3     don't know if maybe at the time I was hoping they

4     would accept a bachelor's of science in lieu of, you

5     know, communications or English, but --

6         Q.    So you agree you didn't have the

7     requisite degree, you also didn't have the requisite

8     experience in lieu of the degree, right?

9         A.    According to this document, it doesn't

10    look like I did, but I wouldn't say that necessarily

11    disqualifies me from the role.

12        Q.    This is the -- this is the job

13    qualifications, right?

14        A.    Yes.

15        Q.    You can agree or disagree with that, but

16    these are the job qualifications.  So according to

17    these job qualifications, you are not qualified; is

18    that correct?

19        A.    That's correct.

20        Q.    Okay.  Do you recall getting a response

21    to your optional mini bid application?

22        A.    Yeah.  Well, I don't know if response

23    would be the correct verbiage, but the outcome.

24        Q.    Did you get an e-mail?

25        A.    I don't recall if I got an e-mail or who

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 150

1   personal leave of absence and spent a good amount of

2   money, and so I didn't have a nest egg at that time.

3   I was hoping for a couple of more paychecks before I

4   got canned, but that didn't happen.

5          **Q.   In the first paragraph you suggest that**

6   **you've been harassed or discriminated against.  On**

7   **what basis were you harassed or -- let's do first**

8   **harass.  On what basis were you harassed?**

9          A.   I had kind of lumped that in with

10  discrimination.  I don't want to say like a catchall

11  or something of that nature, but a lot of time those

12  terms go together and so --

13         **Q.   So you were not harassed?**

14         A.   Well, I wouldn't say that either.

15         **Q.   Okay.  Well, then tell -- then my**

16  **question is on what basis do you believe you were**

17  **harassed?**

18         A.   The meetings with Greg Lofthus, I felt

19  they were unnecessary to an extent.  So he was doing

20  his job seemingly for a portion of the time, and then

21  after a certain point when I had asked about

22  graduation and expected graduation and after other

23  people started graduation -- graduating, our meetings

24  that he had with me just came off as harassing.

25         **Q.   All the other individuals in the academy**

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 151

1　had meetings with their coaches, right?

2　　　　A.　Absolutely.

3　　　　Q.　Okay.　So on what basis do you believe

4　that your coach holding the same kinds of meetings as

5　everyone else in academy was having, how is that

6　harassing to you, Justin Mohn?

7　　　　A.　Well, I had it for longer so -- because I

8　graduated last, besides Angela because she hurt her

9　hip.　It seems like I was being held back, and in the

10　process there were harassing meetings occurring which

11　didn't seemingly need to take place at all.

12　　　　Q.　And that's just your own personal belief

13　that they didn't need to take place; is that right?

14　　　　A.　It's my belief as well as the reason why

15　this has been brought before the court.

16　　　　Q.　The reason this has been brought before

17　the court is based on your belief, correct?

18　　　　A.　Correct.

19　　　　Q.　Okay.　So the only -- you have no basis

20　for your harassment claim other than your own

21　speculation; is that correct?

22　　　　A.　It depends -- everybody sees harassment

23　differently.　I saw it as harassing that I was having

24　to have these meetings with Greg still when everybody

25　else had graduated in my class.

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 152

1    Q.   But everyone else who was in academy,

2    men -- male or female, had to have meetings with their

3    coach, right?

4    A.   Yes.

5    Q.   Okay.  So any other -- so were there --

6    is there any other basis in which you claim you were

7    harassed?

8    A.   When Beverly, I would basically call it,

9    threatened my career with a performance improvement

10   plan.

11   Q.   Okay.  Anything else?

12   A.   Those two would pretty much do it for

13   what I would consider either harassment or

14   discrimination.

15   Q.   Were there any words used that you felt

16   were harassing?

17   A.   No.  I mean, there was no, like, smoking

18   guns, but just the meetings, you know, having those

19   conversations with Greg.  So nothing specifically, but

20   the meetings themselves.

21   Q.   Okay.  Let's take the other word that you

22   used here.  You claim that you were discriminated

23   against.  On what basis do you claim on July 28, 2017,

24   that Progressive discriminated against you?

25   A.   Because -- not just because I was one of

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 165

1          A.    Sounds like something that took place,

2    yes.  Sounds like I -- I don't know if I said anything

3    else besides that, like I have other experience, but,

4    yeah, I think I remember saying that.

5          **Q.    You've admitted today that you did not**

6    **meet either experience or education, right?**

7          A.    Yeah.

8          **Q.    Okay.**

9          A.    I just don't remember if I said that to

10   Jim.

11         **Q.    What did you tell him about the academy**

12   **process?**

13         A.    I likely -- I don't recall exactly, but I

14   likely complained similarly to what I complained about

15   in this action, which was me being held back by Greg

16   and Beverly and me having my career threatened, and

17   then even after I graduated, my career was basically

18   ruined because I had the lowest cede number -- lowest

19   cede number.

20         **Q.    Okay.  And you met with Mr. Lawson -- if**

21   **I tell you that you met with him on August 3, 2017,**

22   **does that sound right to you?**

23         A.    Yes, sounds about right.

24         **Q.    A couple days after that, August 5, 2017,**

25   **do you recall kicking open a door on Progressive**

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 166

1   property?

2          A.   Did you say August 25th or 5th?

3          Q.   5th, August 5.

4          A.   Yeah, I had -- as I've explained to

5   multiple people now, I had opened doors with my foot,

6   like just, you know, walking out -- because I used to

7   play soccer, just open the door with my foot multiple

8   times.  And so that on August 5th sounds familiar.

9   I was just surprised that I got called out on that day

10  for it.

11         Q.   Were your hands full?

12         A.   No, I don't think so.

13         Q.   You could have used your hands to open

14  the door?

15         A.   Yeah.  I could do that on -- you know,

16  with any door.

17         Q.   But instead you chose to kick it?

18         A.   Well, that's one way of putting it.  I

19  like to say I opened it with my foot.

20         Q.   Were you angry about the fact that you

21  hadn't received an agreement to the $5 million demand

22  that you sent to HR?

23         A.   I wasn't angry about not receiving

24  $5 million and nor do I recall if I was angry on that

25  specific day, but I can imagine me not being too happy

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 167

1  with my career at Progressive.

2      Q.    You applied for unemployment in

3  connection with your termination from -- your ultimate

4  termination from Progressive; is that right?

5      A.    That is correct.

6      Q.    Because you were ultimately terminated

7  for involuntary improper conduct, right?

8      A.    That's what Progressive --

9      Q.    Right.  And I'm not asking if you agree

10 with it.  I'm saying that's one of -- you were

11 terminated for that reason, right?

12     A.    Correct.

13     Q.    Okay.  Do you recall -- well, strike

14 that.

15          Do you remember sending a second e-mail

16 to human resources after you kicked open the door and

17 after you were placed on a paid leave of absence?

18     A.    I remember sending -- yes, there was

19 probably one or two.

20     Q.    So August 5, 2017, you kicked the door,

21 and then you were placed on a paid leave of absence

22 after that time; is that right?

23     A.    I think I was placed on the paid leave of

24 absence either the week or two weeks after.

25     Q.    And then you sent a further e-mail to

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 171

1    **overeducated; is that right?**

2         A.   Yes, I do see that in the second

3    paragraph.

4         **Q.   In one of your threats you say that it**

5    **could be resolved by putting you in a fitting position**

6    **as fast as possible.  Why did you think you should be**

7    **promoted as fast as possible?**

8         A.   I felt that -- as I have stated, it

9    seemed like a very intense atmosphere, me being in the

10   position I was at the time, and so I was thinking that

11   in order to get rid of the tension, it might be best

12   to start trying to resolve the issue because this was

13   me kind of hinting that things are likely going to go

14   south soon.

15        **Q.   You applied for two positions at this**

16   **point, both of which you've admitted you weren't**

17   **qualified for, right?**

18        A.   The legal assistant position --

19        **Q.   No, at the point of this e-mail, you had**

20   **not applied for a legal position.  We haven't talked**

21   **about that yet.  You had applied for a senior**

22   **copywriter position and you admitted that you didn't**

23   **qualify for it, right?**

24        A.   According to the document, I didn't meet

25   the minimum qualifications.

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 172

1     Q.   Well, it's Progressive's job description.

2  They're entitled to list what the qualifications are

3  and you didn't meet those, right?

4     A.   They also didn't hire someone that met

5  the qualifications, but, yes, you're right.

6     Q.   You didn't meet any of the

7  qualifications; you didn't have the degree or the

8  experience, right?

9     A.   That's correct.

10     Q.   You had no IT experience, so you didn't

11  meet those qualifications either, right?

12     A.   That's correct.

13     Q.   Okay.  Let's talk about the legal

14  assistant position.  A couple days after you sent this

15  e-mail you applied for a legal assistant position,

16  right?

17     A.   Um-hum.

18     Q.   Did -- at the time that you applied,

19  looks like July 17th -- no, I'm sorry.  It was a

20  couple days after the August 10th e-mail you applied

21  for a legal assistant position; is that right?

22     A.   That's correct.

23     Q.   Okay.  Did you have prior experience as a

24  legal assistant?

25     A.   Not at all.

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 173

1          Q.    Okay.  No -- taken any coursework at a --

2    like a paralegal certificate?

3          A.    No, nothing.

4          Q.    Ever worked as an assistant at all?

5          A.    No.  I just had pro se experience from

6    the past legal issue with Ent.

7          Q.    Sure, but had you told Progressive that

8    you had experience from being a litigant?

9          A.    No.

10         Q.    Okay.  What made you -- so what made you

11   feel qualified for the legal assistant position?

12         A.    No more than I feel qualified for

13   pursuing Progressive as a pro se plaintiff.

14         Q.    So you feel that your experience as a pro

15   se litigant qualified you to be a legal assistant?

16         A.    Oh, maybe I worded that improperly.  I

17   just feel that with my experience, as well as my

18   education, that position, a legal assistant, isn't too

19   far off that I -- I wouldn't be a fit for it.

20         Q.    You were eventually terminated from your

21   employment with Progressive on August 24, 2017; is

22   that right?

23         A.    I actually had August 17th, but they

24   would know better.  It sounds like they have the

25   24th as the effective date and so I will agree to

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 204

 1  **Facebook to people that worked at Progressive?**

 2          A.   I think I recall doing so.  I don't know

 3  if -- I don't know if it got received or if they sent

 4  anything back.

 5               (Deposition Exhibit 42 was marked.)

 6          **Q.   Mr. Mohn, Exhibit 42 is another Facebook**

 7  **message; is that right?**

 8          A.   Yes.

 9          **Q.   From you --**

10          A.   Yes.

11          **Q.   -- right?**

12               **Who did you send that to?**

13          A.   I don't see, but it was most likely to

14  Charlie or Beverly -- to Charlie or Beverly most

15  likely.

16          **Q.   Okay.  Why did you send it to them?**

17          A.   Probably the same reason that we're here

18  today.

19          **Q.   Why did you threaten them?**

20          A.   I wasn't really threatening them.

21          **Q.   You don't consider "pursue you for**

22  **everything you own such that your children end up**

23  **homeless and starving to death" --**

24          A.   It's more of a warning.

25          **Q.   Similar to the types of warnings that you**

JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Justin Mohn v. Progressive Casualty Insurance Company

Page 205

 1    sent to the executives at Ent?

 2         A.   Well, if that's what it takes to get the

 3    issue resolved, then that's what it takes.

 4         Q.   You've got an order -- a criminal order

 5    of protection entered against you for your efforts

 6    against Ent; is that right?

 7         A.   I don't know if it was considered

 8    criminal, but --

 9         Q.   Are you disputing that that was a

10    criminal order of protection?

11         A.   It was definitely a protection order.  I

12    just don't know if it was criminal or civil.

13         Q.   You then filed an EEOC charge; is that

14    right?

15         A.   I don't know if that happened before or

16    after this message, but, yes, that was -- that did

17    occur.

18         Q.   Okay.  And you included your EEOC charge

19    when you filed your complaint in federal court; is

20    that right?

21         A.   Yeah, I believe I had to.

22              (Deposition Exhibit 43 was marked.)

23         Q.   Mr. Mohn, is that the complaint that you

24    filed or caused to be filed in federal court?

25         A.   One of them.  I remember there was -- it

**Received By:**
**Hunter + Geist**

FEB 28 2019

Justin Mohn   01/25/2019
Justin Mohn v. Progressive Casualty Ins. Co.

Non-Confidential
Page 229

```
 1              I, JUSTIN DANIEL MOHN, do hereby certify

 2     that I have read the above and foregoing deposition

 3     and that the same is a true and accurate transcription

 4     of my testimony, except for attached amendments, if

 5     any.

 6                    Amendments attached   ( ✓ ) Yes   ( ) No

 7

 8

 9                    JUSTIN DANIEL MOHN

10

11              The signature above of JUSTIN DANIEL MOHN

12     was subscribed and sworn to or affirmed before me in

13     the county of  El Paso       , state of

14     Colorado          , this  28th  day of

15     February         , 2019.

16

17

18                    Notary Public

19                    My commission expires  12/4/2022

20

21

22

23

24

25     Justin Mohn, 01/25/19 (ts)
```

STEPHANIE RICHARDSON
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20184046353
MY COMMISSION EXPIRES DECEMBER 4, 2022

Received By:
Hunter + Geist

FEB 28 2019



# Hunter + Geist, Inc.

Court Reporting, Legal Videography, and Videoconferencing
1900 Grant Street, Suite 1025, Denver, Colorado 80203
303-832-5966 / scheduling@huntergeist.com

## AMENDMENTS TO DEPOSITION

The deponent, __Justin Mohn_____, wishes to make the following changes in the deposition:

| Page | Line | Should Read | Reason |
|------|------|-------------|--------|
| 32 | 13 | I don't recall | Plaintiff doesn't recall if he testified in any past legal issue |
| 34 | 4-6 | September 27, 2016, and I was not yet employed at Progressive. | Plaintiff estimated date during deposition, found accurate date. |
| 59 | 4-5 | My last boss was named Marlene. I think Marlene Dietrich or Marlene Mitchell. | Plaintiff forgets last boss's surname. |
| 60 | 9-10 | Yeah. Tek-Experts is the contractor for Microsoft. | Plaintiff misspoke who was contractor for who. |
| 64 | 19 | I may have, I don't recall. | Plaintiff filed an inquiry with EEOC, he did not have phone interview. |
| 98 | 18 | female (besides Angela who hurt her hip) graduated before me. | Plaintiff adds phrase in parentheses because this was implied, not said. |
| 105 | 23 | There was just one other guy (besides Dan, who was a previous employee and on a faster pace.) | Plaintiff adds phrase in parentheses because this was implied, not said. |
| 135 | 19-20 | Approximately July 2016 to September 2016 | Plaintiff estimated date during deposition, found more accurate date. |
| 176 | 7-8 | around that time I started producing my first music album and composing my second music album. | Plaintiff misspoke due to working on both albums before first was released. |
| 178 | 3-4 | The Story of Humanity is the title of my first album. Colofunkinrado is the title of my second album. | Plaintiff misspoke due to working on both albums before first was released. |

Subscribed and sworn to or affirmed before me
this 28th day of February, 20 19

_____
Notary Public

My Commission Expires: 12/4/2022

_Justin Mohn_____
Signature of Deponent

STEPHANIE RICHARDSON
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20184046353
MY COMMISSION EXPIRES DECEMBER 4, 2022

Amendment Sheet

Page 1 of 1

Received By:
Hunter + Geist

FEB 28 2019



# Hunter + Geist, Inc.

Court Reporting, Legal Videography, and Videoconferencing

1900 Grant Street, Suite 1025, Denver, Colorado 80203

303-832-5966 / scheduling@huntergeist.com

## AMENDMENTS TO DEPOSITION

The deponent, Justin Mohn _____, wishes to make the following changes in the deposition:

| Page | Line | Should Read | Reason |
|------|------|-------------|--------|
| 182 | 14 | your court issue was the reason why your scoliosis | Plaintiff meant to communicate the word "court," not "core." |
| 186 | 19 | I'll execute the release then if the Courts compel me to do so. | Defendant's question was loaded, confusing, and misleading |
| | | Plaintiff hereby requests the following to be marked CONFIDENTIAL per the Protection Order due to questions and answers which may infringe upon a confidentiality agreement between Plaintiff and another, third party to this case. | |
| | | Page 25, line 14 to page 47 line 21 | |
| | | Page 109, line 21 to page 110, line 4 | |
| | | Page 148 line 21 to page 149 line 7 | |
| | | Page 173 lines 5-6 | |
| | | Page 194 lines 9-17 | |
| | | Page 204 line 25 to page 205 line 12 | |

Subscribed and sworn to or affirmed before me

this 28th day of February, 20 19

_____
Notary Public

My Commission Expires: 12/4/2022

_____
Justin Mohn
Signature of Deponent

STEPHANIE RICHARDSON
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20184046353
MY COMMISSION EXPIRES DECEMBER 4, 2022

Amendment Sheet

Page 1 of 1

**JUSTIN DANIEL MOHN - 1/25/2019 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL**
**Justin Mohn v. Progressive Casualty Insurance Company**

Page 230

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           ) ss.
COUNTY OF DOUGLAS          )

       I, TINA M. STUHR, Registered Professional Reporter and Notary Public ID 20054029701, State of Colorado, do hereby certify that previous to the commencement of the examination, the said JUSTIN DANIEL MOHN was duly sworn or affirmed by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

       I further certify that I am not employed by, related to, nor counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

       IN WITNESS WHEREOF, I have affixed my signature this 8th day of February, 2019.

       My commission expires July 28, 2021.

__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing was not required.